ed most favorable results. indeed upon which he seems to have staked his final hope of changing his condition and of acquiring the fortune which had so long eluded his pursuit. This hope was suddenly blasted, and, on the same evening when this disappointment occurred, he had an angry altercation with his wife and son. During the same night he committed suicide. May not these circumstances have produced a recurrence of the irrational mood if which his previous conduct had shown him to be so susceptible, and have left him with a subverted will, powerless to resist an impulse to do what, in the last letter written by him, he said he "hated and despised?" I cannot say that such an inference is unwarrantable, although it is the result of an interpretation of the evidence most favorable to the verdict. But I am bound to adopt it, and hence the motion for a new trial must be denied, and judgment upon the verdict ordered to be entered.

———

WATERS (PELTON v.). See Case No. 10,-913.

WATERS (STANBACK v.). See Case No. 13,284.

WATERS (STODDERT v.). See Case No. 13,472.

WATERS (WRIGHT v.). See Case No. 18,-100.

WATERSON (SOHN v.). See Case No. 13,-161.

WATERTOWN (PERELES v.). See Case No. 10,980.

WATERTOWN (PERKINS v.). See Case No. 10,991.

———

## Case No. 17,268.

### The WATER WITCH.

[Blatchf. Pr. Cas. 300.] [1]

District Court, S. D. New York. Dec., 1862.

VIOLATION OF BLOCKADE.

Vessel and cargo condemned as enemy property, and for an attempt to violate the blockade.

In admiralty.

BETTS, District Judge. This vessel was captured August 23, 1862, off Aransas Bay, Texas, by the yacht Corypheus, a tender to the United States bark Arthur, and was libelled in this court November 24, 1862. On the return of the attachment of the vessel and cargo, December 16, due proceedings were taken by the libellants for obtaining a decree by default against both, because of the failure of any party to intervene and defend. The ship's papers and the preparatory proofs were submitted to the court, and a final decree of condemnation was thereupon prayed by the libellants. Only one witness, the master of the vessel,

———

[1] [Reported by Samuel Blatchford, Esq.]

was brought into this port and examined by the prize commissioners. The master, by his affidavit, excuses the non-production of the remainder of the captured crew, because they were all Spanish and Portuguese subjects, as they informed him, and had been taken out of prison in Havana, and impressed into service on board the prize, and it was regarded as imprudent and dangerous to send them with the vessel into this port. They were, accordingly, left at Pensacola. The master of the vessel, Thomas B. King, testifies that he resides in Texas with his family, has been a resident for seventeen years of that state, and was a citizen of that state before the Rebellion. He claims to be a subject of Great Britain. He asserts that he owns the vessel and cargo; that she was bound from Havana to Matamoras, on the Rio Grande; and that she was not intentionally pursuing a course wide of that port when arrested. The place of capture was but two or three miles from land, near the mouth of Aransas Harbor, and one hundred and twenty or one hundred and thirty miles from Matamoras. She was seized because she was suspected of attempting to evade the blockade. Her lading was salt, rope, drugs, soda, potash, skins, and one hundred and fifty kegs of powder. She was bought by the master about eighteen months before her capture, and was conveyed to him by a bill of sale, in Galveston, by William Johnson, a resident there. He obtained a provisional register for the vessel in his own name (as of the state of Texas, in the United States of America), at Kingston, Jamaica, May 27, 1862. He knew all about the war, and supposed that the ports of Texas were blockaded. He had sailed the vessel out of the blockaded port, with a cargo, to Havana, in February previous. He went out of Galveston with her in the night, and in a fog. The frigate Santee was then blockading the port. He had a lady passenger on board from Havana to Aransas and Galveston when he was seized. The papers are exceedingly confused, and seem to include references to various voyages, without any distinctness or discrimination, but they and the proofs abundantly establish the hostile character of the vessel and cargo, and also the design and attempt of the owner of both to violate the blockade existing at the port where she was arrested.

Let there be a decree of condemnation and forfeiture of vessel and cargo.

———

WATER WITCH, The (BROWER v.). See Case No. 1,971.

WATHEN (BOWMAN v.). See Case No. 1,-740.

———

## Case No. 17,269.

### Ex parte WATKINS.

[See Case No. 16,650.]